# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GAD SMITH and JEAN SMITH,
Individually and as Co-Trustees of the
Gad Smith and Jean Smith
Revocable Trust dated February 28, 1995,

                Plaintiffs,

   -vs-                                                                         Case No. 11-C-71

THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY,

                Defendant.

# DECISION AND ORDER

In this proposed class action, Gad Smith and his wife, Jean Smith, allege claims for breach of contract and breach of fiduciary duty against the Northwestern Mutual Life Insurance Company ("NML"). Smith borrowed money from NML through loans secured by the cash value of his life insurance policies. Pursuant to a 1977 amendment, these loans were subject to a variable interest rate with an 8% ceiling. Smith alleges that NML has consistently charged 8% interest despite the "sustained drop in interest rates since 1990 and the current historically low interest rate environment." NML moves to dismiss for failure to state a claim. For the reasons that follow, NML's motion is granted.

## Background

In the 1960s and 1970s, Gad Smith purchased a series of six (6) whole life insurance policies from NML. The policies purchased in the 1960s provided that "policy and premium

loans shall bear interest at the rate of 5% per annum." The policies purchased in the 1970s provided that "policy and premium loans shall bear interest at the rate of 6% per annum, but the company may establish a lower rate for any period during which any such loan is outstanding. . ."

On or about February 10, 1977, NML made offers to Smith and numerous other whole life policyholders to amend certain policy language regarding loan interest rates. NML President F.E. Ferguson described the amendment as follows:

> We recently introduced new policies which are expected to provide lower cost life insurance. The lower cost will result from higher dividends made possible by a new policy loan interest rate provision.
>
> The new provision contains a flexible policy loan interest rate. The rate will be adjusted up or down in line with prevailing long term economic conditions but will never be higher than 8%. Policies with this new provision currently earn higher dividends than policies such as yours that have a 5 or 6% policy interest rate.
>
> Included with this letter is an offer to amend the loan provision of your existing policy so that you may share in the higher dividends expected for the new policies. If you accept this offer, the flexible provision with an 8% maximum interest rate will apply to any existing or future loans on your policy.
>
> The accompanying offer illustrates the effect this change would have on your policy's current dividend. Your present loan rate and the current loan rate under the new provisions are shown. A copy of the amendment is printed on the back of the offer. More details appear on the inside of this letter.
>
> The Northwestern Mutual is owned and operated by and for the benefit of its policyholders. Over the years, whenever possible, we have made features of new policies available to older policies. This new loan provision is a significant feature, and

> the purpose of the letter is to give you an opportunity to amend your policy to include it.
>
> We believe this new provision will be to your advantage unless you expect to borrow extensively on your policy over long periods of time. To accept the offer, simply sign and detach the acceptance form and return it in the envelope provided.

Complaint, Exhibit A (emphasis added).

Smith was also provided with a written statement that described the amendment as follows: "Your policy loan interest rate is 5% [or 6%]. If you accept this offer, the current loan interest rate will be 8%. (The Company cannot charge more than 8% and may charge less as long term economic conditions warrant)." Complaint, Exhibit B. In return for accepting NML's amendment, owners of the 5%/6% policies were offered the right to participate in a higher tier dividend class. The illustration explained that the proposed loan provision would have resulted in a 14.19% dividend increase for the prior policy year (1976). *Id.*

The offer documents sent to Smith also included an annotated "Amendment of Loan Provisions of Policy." Complaint, Exhibit C.[1] Under the heading "Loan Interest," the proposed amendment stated: "Interest on policy and premium loans is payable at the rate of 8% compounded annually, or at any lower rate established by the Company for any period

---

[1] The complaint alleges that this document was not received until after the offer was accepted. However, Smith's brief in opposition to the motion to dismiss makes it clear that Exhibit C was included among the "Offer Documents." The Court can consider Smith's brief to clarify the allegations in the complaint. *Schultz v. Aviall, Inc. Long Term Disability Plan*, — F. Supp. 2d —, 2011 WL 1337345, at *9 n.4 (N.D. Ill.) (citing *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000)).

-3-

during which the loan is outstanding." An annotation in the margin stated: "Maximum effective interest rate 8%. Can be less." *Id.*

Smith accepted the amendment. A confirmation letter explained that the amended provisions provide for a "flexible policy loan interest rate no greater than 8%." Complaint, Exhibit D. The confirmation also included an un-annotated version of the amendment. Over the years since the amendment, Smith has taken out numerous policy loans, but NML has never charged lower than 8% interest.

**Analysis**

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In other words, a complaint fails to state a claim when its well-pleaded facts fail to show that the plaintiff is entitled to relief. In evaluating a motion to dismiss, the court accepts the plaintiff's well-pleaded allegations as true, and draws reasonable inferences in plaintiffs' favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081. While the plaintiff must plead enough facts to state a plausible claim, a complaint can also plead too much by "pleading facts that establish an impenetrable defense . . ." *Id.* at 1086. Finally, the Court may consider the language in Smith's insurance policies, even though they were not attached to his complaint. "[D]ocuments that are referred to in the complaint and that are central to a claim that is made

may be considered to be part of the complaint even if not actually attached to the complaint. " *Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002).

**I.  Breach of Contract**

Smith alleges that NML breached the amendment by failing to vary the interest rate on policy loans "in line with prevailing economic conditions." The amendment itself, as stated above, provides that interest on policy and premium loans "is payable at the rate of 8% compounded annually, or at any lower rate established by the Company for any period during which the loan is outstanding." The amendment also states that it "shall be governed by the law of the State of residence of the Owner at the time the amendment is accepted." Smith was a resident of Missouri at the time he accepted the amendments. Therefore, the Court must look to Missouri law to construe the meaning of the amendment. *S.A. Healy Co. v. Milwaukee Metro. Sewerage Dist.*, 50 F.3d 476, 478 (7th Cir. 1995) (Wisconsin respects and enforces choice-of-law agreements).

In Missouri, the "general rules for interpretation of other contracts apply to insurance contracts as well. The key is whether the contract language is ambiguous or unambiguous." *Peters v. Employers Mut. Cas. Co.*, 853 S.W.2d 300, 301-02 (Mo. 1993). The parol evidence rule bars extrinsic evidence in construing an integrated, unambiguous contract. *Lee v. Bass*, 215 S.W.3d 283, 288 (Mo. Ct. App. 2007). Such evidence cannot alter or vary the terms of a written contract. *Foley Co. v. Walnut Assoc.*, 597 S.W.2d 685, 688 (Mo. Ct. App. 1980). When insurance policies are unambiguous, they will be enforced as written. *Rodriguez v. Gen. Accident Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo. 1991). Whether an insurance

policy is ambiguous is a question of law. *Martin v. U.S. Fid. & Guar. Co.*, 996 S.W.2d 506, 508 (Mo. 1999).

The amendment itself is very clear, as it entitles NML to charge any interest rate on policy loans that it sees fit, so long as the rate does not exceed 8%. Smith tries to evade the plain language of the amendment by characterizing it as a contract of adhesion, in accordance with two scholarly opinions from the Missouri Court of Appeals: *Spychalski v. MFA Life Ins. Co.*, 620 S.W.2d 388 (Mo. Ct. App. 1981) and *Estrin Const. Co., Inc. v. Aetna Cas. & Sur. Co.*, 612 S.W.2d 413 (Mo. Ct. App. 1981). "A life insurance policy is a contract of adhesion. The terms of such a contract, by almost universal practice, are not read nor are they expected to be read. That is because except for the cost, the term, the monetary limits of coverage and, in a very rough way, the risks to be covered the words are not the subject of the transaction, the product or service is." *Spychalski,* 620 S.W.2d at 392-93 (internal citations omitted). Therefore, in an adhesion contract, "the assent is resembled rather than actual. The printed words are not enough to disclose the expectations of the parties. The court must look for that purpose to the full circumstances of the transaction whether the written words of the contract be ambiguous or unambiguous." *Id.* at 393 (citing *Estrin*). The offer letter from NML's president, contrary to the plain language of the actual amendment, explained that the rate "*will* be adjusted up or down in line with prevailing long term economic conditions but will never be higher than 8%" (emphasis added). Therefore, Smith argues that it was objectively reasonable for him to expect that interest rates would be adjusted downward. "[A] term of a non-negotiated insurance policy, or other standard

contract, which does not meet reasonable expectations of the great majority of adherents is unfair and so subject to the judicial power to correct." *Estrin*, 612 S.W.2d at 426.

As an initial matter, decisions from an intermediate court of appeals are merely persuasive authority for a court acting in diversity. Under the *Erie* doctrine, the Court must "predict what the state's highest court will do. Once the state's highest court acts, the need for prediction is past. But decisions of intermediate state courts lack similar force; they, too, are just prognostications." *Reisser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004). As one district court observed, cases decided after *Spychalski* and *Estrin* reveal that the Supreme Court of Missouri "does not view all insurance policies as adhesion contracts." *Indep. Petrochemical Corp. v. Aetna Cas. & Surety Co.*, 842 F. Supp. 575, 581 (D.D.C. 1994) (citing *Robin v. Blue Cross Hosp. Serv., Inc.*, 637 S.W.2d 695 (Mo. 1982)). Moreover, "Missouri's highest court reaffirmed the principles of the parol evidence rule without mentioning *Estrin*." *Id.* at 581-82 (citing *Emerick v. Mut. Ben. Life Ins. Co.*, 756 S.W.2d 513, 523 (Mo. 1988)). "It is thus clear that Missouri has implicitly if not explicitly rejected *Estrin*." *Id.* at 582. At a minimum, it seems questionable to assume that the Missouri Supreme Court would allow the use of parol evidence to vary the terms of an unambiguous insurance contract, much less a simple, single-page amendment thereto.

Even if the Missouri Supreme Court would endorse the approach set forth in *Estrin* and *Spychalski*, the result in this case would be the same. "In construing a standardized contract under Missouri law . . . we are to 'effectuate the reasonable expectations of the average member of the public who accepts it.'" *Haines v. St. Charles Speedway, Inc.*, 874

F.2d 572, 575 (8th Cir. 1989) (citing *Estrin* at 419 n.4 and *Spychalski* at 393 n.6). "The central lesson in *Estrin* is that contracts of adhesion are judicially interpreted on the basis of the 'principle of reasonable expectations' of the parties. 'The law, therefore, protects expectations *objectively* reasonable, as consonant with the purpose of the standard contract – to avoid bargains over details of an individual transaction to achieve lower cost possible only by mass transaction.'" *Vergano v. Facility Mgmt. of Missouri, Inc.*, 895 S.W.2d 126, 128 (Mo. Ct. App. 1995) (citing *Estrin* at 423) (emphasis in original).

The loan interest amendment is not akin to a lengthy, underwritten insurance contract. The proposed amendment (with annotations) comprises a single page. It was clearly meant to be read, and a reasonable offeree would have read its operative language. Even though the cover letter states that the interest rate "will be adjusted up or down in line with prevailing long term economic conditions," the actual language of the amendment makes it clear that lower interest rates are not a guarantee: "Interest on policy and premium loans is payable at the rate of 8% compounded annually, or at any lower rate established by the Company . . ." This is emphasized and clarified by the rest of the materials: "The Company cannot charge more than 8% and *may* charge less as long term economic conditions warrant;" "Maximum effective interest rate 8%. *Can* be less." After reading all of the documents in the offer package, an average, reasonable person would not conclude that NML was promising lower interest rates in line with future economic conditions. By accepting NML's offer, Smith manifested his assent to the clear and unambiguous language of the interest loan amendment. *Vergano*, 895 S.W.2d at 128 ("Assuming, without deciding, the release is a

-8-

contract of adhesion – one not negotiated by parties while on equal footing – it was enforceable in this case because its terms were simple and clear and both parties could reasonably expect enforcement of its terms"); *Haines*, 874 F.2d at 575 ("To hold that a reasonable person would not realize the significance of the release . . . would be to ignore the unambiguous text of the document").

## II. Good faith and fair dealing

Smith also argues that NML breached its duty of good faith and fair dealing. In Missouri, a covenant of good faith and fair dealing is implied in every contract. *Farmers' Elec. Co-op., Inc. v. Mo. Dep't of Corr.*, 977 S.W.2d 266, 271 (Mo. 1998). The duty of good faith and fair dealing prevents one party from exercising a judgment "conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract. When a contract provides a single party with discretion, that discretion is not unlimited; it must not be exercised to deprive the other party of the benefit of the contractual relationship or evade the spirit of the bargain." *City of St. Joseph v. Lake Contrary Sewer Dist.*, 251 S.W.3d 362, 370 (Mo. Ct. App. 2008). Conversely, the implied duty of good faith is "incapable of altering the express terms" of an agreement which "clearly vest[s] discretion" with one of the contracting parties. *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 466 (8th Cir. 2002) (applying Missouri law). "The law does not allow the implied covenant of good faith to be an everflowing cornucopia of wished-for legal duties; indeed, the covenant cannot give rise to new obligations not otherwise contained in a contract's express terms." *Comprehensive Care*

*Corp. v. RehabCare Corp.*, 98 F.3d 1063, 1066 (8th Cir. 1996) (citing *Glass v. Mancuso*, 444 S.W.2d 467-68 (Mo. 1969)).

In a case almost precisely on point, the Fourth Circuit, applying Virginia law, found that there was no implied good faith obligation to lower the interest rate charged on an adjustable rate loan. *Riggs Nat'l Bank of Wash. v. Linch*, 36 F.3d 370 (4th Cir. 1994). In *Riggs*, the borrowers were charged interest "at an annual adjustable rate, adjusted daily, which is determined by adding three (3) percentage points to the 'Riggs Prime Rate,' but in no event to exceed fifteen percent (15%). The Riggs Prime Rate shall mean the rate of interest established from time to time and publicly announced by [Riggs], in its sole discretion . . ." The court held that "an implied duty of good faith cannot be used to override or modify explicit contractual terms." 36 F.3d at 373 (citing cases). "Although the rate of interest charged under the Note was subject to a 'ceiling' of fifteen percent, the Note explicitly recognized that Riggs had the 'sole discretion' to set its prime rate and that the 'Riggs Prime Rate is not necessarily the lowest or most favorable rate of interest charged by [Riggs] on loans to its customers.'" *Id.* Under these circumstances, "it cannot be disputed that the Note conferred upon Riggs the sole discretion to set its own prime rate and that no implied duty of good faith can be relied upon for a renegotiation of the terms of the Note." *Id.*

Smith relies on *Tymshare, Inc. v. Covell*, 727 F.2d 1145 (D.C. Cir. 1984), an opinion authored by Judge (now Justice) Scalia on the duty of good faith. In *Tymshare*, the plaintiff claimed that the retroactive adjustment of quotas under a commission-based compensation

-10-

plan was bad faith performance. The contract provided that the employer could change the quota "at any time during the quota year within their sole discretion." The "object" of the court's inquiry in *Tymshare* was to determine "whether it was reasonably understood by the parties to this contract that there were at least certain purposes for which the expressly conferred power to adjust quotas could not be employed." 727 F.2d at 1153. The court reasoned that it is "'possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant.' But the trick is to tell *when* a contract has been so drawn – and surely the mere recitation of an express power is not always the test." *Id.* at 1153 (internal citations omitted) (emphasis in original). The court found as follows:

> Where what is at issue is the retroactive reduction or elimination of a central compensatory element of the contract – a large part of the *quid pro quo* that induced one party's assent – it is simply not likely that the parties had in mind a power quite as absolute as appellant suggests. In the present case, agreeing to such a provision would require a degree of folly on the part of these sales representatives we are not inclined to posit where another plausible interpretation of the language is available. . . . [T]he language need not (and therefore can not reasonably) be read to confer discretion to reduce the quota for any reason whatever – including what Covell has alleged here, a simple desire to deprive an employee of the fairly agreed benefit of his labors.

*Id.* at 1154.

*Tymshare* is distinguishable from the instant case. As the Fourth Circuit explained in *Riggs*, "the Borrowers could not have had a reasonable expectation that Riggs' discretion to set its own prime rate would be constrained by the ebb and flow of other commercial or governmental rates of interest. Indeed, *Tymshare* is inapplicable here precisely because the

-11-

Note at issue in this case, unlike the contract at issue in *Tymshare*, did not confer an *unfettered* discretion upon one party to determine the extent of the other party's contractual obligations. Rather, Riggs' discretion was expressly 'fettered' by the bargained for limitation that the interest charged under the Note would not exceed 15 percent." *Riggs* at 373 (emphasis in original). The interest rate ceiling is not an "insignificant limitation." *Id.* at 373 n.2. Smith, like the borrower in Riggs, gained significant protection from the interest rate ceiling when interest rates were much higher. D.12, Tab 2 (Moody's Historic Bond Rates, 1979-2010).[2] Because Smith gained this protection, the loan interest amendment can reasonably be read to grant NML the discretion to charge whatever rate it wants up to the 8% ceiling. The Missouri Supreme Court would reach the same conclusion.

### III. Breach of fiduciary duty

Smith also alleges that NML breached its fiduciary duties by charging an unchanging 8% loan interest rate pursuant to the loan rate amendment. Smith argues for the application of Wisconsin law pursuant to the internal affairs doctrine, a "conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs – matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders – because otherwise a corporation could be faced with conflicting demands." *Atherton v. F.D.I.C.*, 519 U.S. 213, 223-24 (1997). Smith's claim does not implicate the internal affairs of NML. "It is essential to distinguish between acts which can be performed by both corporations and individuals, and those activities which

---

[2] The Court may take judicial notice of historic economic data without converting this motion into a motion for summary judgment. *Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

are peculiar to the corporate entity. . . . [T]his doctrine governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders." *McDermott Inc. v. Lewis*, 531 A.2d 206, 214-15 (Del. 1987) (emphases in original).

Smith seems to suggest that he can state a claim for breach of fiduciary duty simply because NML is a mutual insurance company. A mutual insurance company issues no capital stock and is cooperatively owned by its policyholders, who are both the insurers and the insured. 1A Fletcher Cyclopedia of the Law of Private Corporations § 75. They are "organized, maintained, and operated solely for the benefit of their policyholders." *State Farm Mut. Ins. Co. v. Superior Court of L.A. County*, 8 Cal. Rptr. 3d 56, 62 (Cal. Ct. App. 2003). But mutual insurance companies do not *always* act in a fiduciary capacity with respect to their members. *Ormond v. Anthem, Inc.*, — F. Supp. 2d —, 2011 WL 2619618, at **21-27 (S.D. Ind.) (surveying the law in various jurisdictions). To the extent that NML owes Smith a fiduciary duty when it loans him money, the scope of that duty is a function of NML's obligations pursuant to the policy. Therefore, the choice of law provision in the interest loan amendment controls. *Weil v. Morgan Stanley DW, Inc.*, 877 A.2d 1024, 1034 (Del. Ch. 2005) ("I fail to grasp any principled basis for evaluating Weil's fiduciary duty claim under a law different from that which the parties chose to govern the contract between them . . ."). Once again, the Court must look to Missouri law to determine whether Smith can state a claim. *In re Lois/USA, Inc.*, 264 B.R. 69, 105 (Bankr. S.D.N.Y. 2001); *Florida St. Bd. of Admin. v. Law Eng'g & Envt'l Servs., Inc.*, 262 F. Supp. 2d 1004, 1013-14 (D.

Minn. 2003) (choice of law clause governs because the fiduciary duty claim "arises from the contract between the parties and is closely related to defendant's performance under the contract").

Under Missouri law, an "insurer owes a duty to exercise good faith in evaluating and negotiating *third party claims* against its insured and may be held liable in tort (commonly referred to as the tort of bad faith) by its insured for a third party judgment in excess of the policy limits in the event it fails to exercise good faith in the performance of its fiduciary obligation." *Duncan v. Andrew County Mut. Ins. Co.*, 665 S.W.2d 13, 18 (Mo. Ct. App. 1983) (emphasis added). This duty does not extend to Smith's first-party claim. "The postulate for this fiduciary relationship is notably absent in claims by an insured against an insurer under policies of property and related types of insurance. Such claims are not controlled by the insurer to the exclusion of the insured nor is the specter of a judgment against an insured in excess of coverage a present danger if an insurer fails to exercise good faith. In first party claims by insureds against insurers under policies affording coverage for loss or damage to property and related types of insurance, the parties occupy a contractually adversary or creditor-debtor status as opposed to standing in a fiduciary relationship." *Id.* at 19. Therefore, Smith cannot state a claim for breach of fiduciary duty under Missouri law. *Pool v. Farm Bureau Town & Country Ins. Co.*, 311 S.W.3d 895, 907 (Mo. Ct. App. 2010) ("There is no dispute that this was a first party claim by Plaintiffs against their insurer. . . . As a matter of law, the parties' relationship was adversarial, not fiduciary").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1. NML's motion to dismiss [D. 7] is **GRANTED**; and

2. This matter is **DISMISSED**. The Clerk of Court is directed to enter judgment accordingly.

**Dated at Milwaukee, Wisconsin, this 13th day of September, 2011.**

**BY THE COURT:**

_____
**HON. RUDOLPH T. RANDA**
**U.S. District Judge**